**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| KEITH WASSEL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PORTILLO'S INC. and MICHAEL OSANLOO,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION<br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Keith Wassel ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Class Action Complaint for Violations of the Federal Securities Laws against Defendants (as defined herein), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Portillo's Inc. ("Portillo's" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons who purchased shares of Portillo's common stock between September 19, 2023 and May 4, 2026, both dates inclusive (the

"Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against Portillo's and certain of the Company's senior officers.

2. Portillo's is a fast-casual restaurant chain that specializes in Chicago-style food, such as Italian beef sandwiches and Chicago-style hot dogs and sausages.

3. During the Class Period, the Company had approximately 100 restaurants, with about half of those in Illinois. Portillo's claimed, however, to have a goal of reaching over 900 restaurants. To do so, it needed to expand into additional markets. Defendants assured the market that the Company had developed a repeatable playbook for opening new stores and that increased density and scale would inure to Portillo's benefit.

4. This was untrue. The Company's expansion has gone poorly, especially in Texas. Portillo's failed to spend enough on marketing and its brand remained largely unknown outside of Illinois. In addition, the Company grew too rapidly and cannibalized its own store sales. As a result, the Company's new restaurants underperformed.

5. Portillo's began to disclose the impact of this issue on its results on August 5, 2025. On that day, the Company cut its 2025 revenue growth guidance roughly in half along with a drastic reduction in adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") growth. On this news, the Company's stock price fell $2.21 per share, or 23.2%, from $9.49 per share on August 4, 2025, to close at $7.28 per share on August 5, 2025, on unusually heavy volume.

6. Then, on May 5, 2026, before the market opened, Portillo's announced disappointing financial results that included: (i) a same-restaurant sales decrease of 0.1%; (ii) a decrease in operating income of $5.9 million, to just $4.5 million from $10.4 million; (iii) a net

loss of $0.5 million; (iv) a restaurant-level adjusted EBITDA of $34.8 million, a decrease of $1.8 million; and (v) adjusted EBITDA of $18.5 million, a decrease of $2.8 million.

7. Led by a new Chief Executive Officer, the Company announced a review of its priorities in order to "build[] a sustainable, long-term plan." Portillo's also stated, in stark contrast to its previous strategy, that it would only open three new restaurants for the entire remaining fiscal year.

8. On this news, Portillo's stock price fell $1.23 per share, or 21.5%, from $5.72 per share on May 4, 2026, to close at $4.49 per share on May 6, 2026, on unusually heavy volume.

9. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) Portillo's rapid expansion was going poorly, as it overbuilt in areas without any name recognition, cannibalized its own stores, and marketing could not drive enough additional interest to justify the expansion; (ii) the Company was having to offer promotions to drive interest, which was decreasing same-restaurant sales; and (iii) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

12. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act, 15 U.S.C. §78aa, because Portillo's maintains executive offices in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

13. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14. Plaintiff Keith Wassel, as set forth in the certification attached hereto and incorporated by reference herein, purchased Portillo's common stock during the Class Period and suffered damages as a result.

15. Defendant Portillo's owns and operates fast-casual and quick-service restaurants specializing in Chicago street food including Chicago-style hot dogs and sausages, Italian beef sandwiches, char-broiled burgers, chopped salads, crinkle-cut fries, homemade chocolate cake, and its signature chocolate cake shake. As of December 28, 2025, Portillo's had 102 restaurants across eleven states, including one restaurant owned by an entity in which the Company owned 50% of the equity. Portillo's common stock trades on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "PTLO."

16. Defendant Michael Osanloo ("Osanloo") was Portillo's President, Chief Executive Officer, and a director from September 2021 to September 2025.

17. Defendants Osanloo and Portillo's are referred to herein as the "Defendants."

18. Defendant Osanloo was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition,

acquisition plans, and present and future business prospects, as alleged herein. In addition, defendant Osanloo was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

19. As an officer and controlling person of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the Nasdaq, which is governed by the provisions of the federal securities laws, defendant Osanloo had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects. In addition, defendant Osanloo had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information. Defendant Osanloo's false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20. Defendant Osanloo, because of his positions of control and authority as an officer and director of the Company, was able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Defendant Osanloo was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, defendant Osanloo is responsible for

the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

21. Founded in 1963, Portillo's owns and operates fast-casual restaurants in the United States. The Company offers Chicago-style hot dogs and sausages, Italian beef sandwiches, char-broiled burgers, chopped salads, crinkle-cut and cheese fries, homemade chocolate cakes, and a signature chocolate cake shake.

22. In 2023, the Company opened its first restaurant in Colony, Texas. Defendants presented the Colony, Texas, expansion as a success and began to rapidly open additional stores in Texas and the Sunbelt. Defendants repeatedly represented that they had developed a proven, repeatable national expansion model capable of generating industry-leading unit economics and sustaining 12% to 15% annual unit growth, while internally struggling with awareness, market density, demand forecasting, and site-selection problems that later forced a strategic reset of the entire development strategy.

23. The Class Period begins on September 19, 2023. On that day, Portillo's held what it called the "2023 Portillo's Development Day." As part of the "Development Day," Defendants presented on Portillo's planned expansion to over 900 restaurants in total. In describing the Company's development process, defendant Osanloo stated:

> We are accelerating our growth but we're doing it in a very disciplined fashion. We're not chasing growth for the sake growth. We're still at a very early stage. We're accelerating it because we have the playbook in place now to start to accelerate. Our site selection is driving attractive results. And by the way, and it means a lot to us because we're still cognizant of the fact that we're putting a lot of capital, a lot of investor money into the dirt. We can't -- we're not building 50 restaurants, 5 might fail. We'll close down 20 next year, open 60. That's not who we are.

> We open restaurants. We expect them to be open forever. We don't close restaurants. So when we build a restaurant, we've got to be incredibly confident that it's going to be a success. We feel great about derisking our openings. We're seeing our openings perform better than they ever have. We're seeing flatter penetration curves. We're seeing happier guests, happier team members and our NRO playbook is there, and we've built that capability ahead of need. So I feel great about that.
>
> And then this optimized footprint, the new restaurant, the TAM, Michelle will wrap this all up for you. But in a very, very, very attractive restaurant company investment should be even more attractive after you hear about this.

24. Defendant Osanloo also highlighted the success of the Colony, Texas, restaurant, explaining that it still made money despite the development costs, stating:

> We're blessed with ridiculously high AUVs. So even in a place like Texas, where we have invested so many people to make sure that Texas opened strong, we've had effectively 5 GMs working in the Colony. We have deployed resources there. Derrick talked about how important it was for us to train those people. So we rented a facility to train. You can do all of that. But when you're doing a $14 million run rate, you're still going to make a lot of money. And it's that incremental revenue, our volumes are so attractive that it allows us to not be like sort of penny pinching when it comes to training, development and people. We have the benefit of being able to invest heavily in that and still have great margins.

25. Defendant Osanloo stated that Portillo's already opened five restaurants in the Dallas, Texas, market and that opening the additional restaurants creates "density and scale" and Portillo's was "crushing it" in those restaurants. In particular, he stated:

> And in fact, one of the things that's exciting is you can see in the red highlight, we have -- we will have opened actually 1, 2, 3, 4 in the DFW Metroplex within a year. We actually already publicly announced the fifth one. Remember, there was one restaurant that we just decided was -- it was going to be too hard to try to open this year. So we pushed into early '24. That's in Denton, Texas. And so what -- we will have opened 5 restaurants in the Dallas, Texas market within one calendar year. Feel great about that. And that's how we achieve density and scale in a very, very attractive market, where we are already crushing it. So we feel really, really good about that

26. On November 2, 2023, the Company announced its financial results for the third quarter ended September 24, 2023. That same day, Portillo's held an earnings call with analysts and investors. During the call, defendant Osanloo highlighted the Company's revenue growth,

attributing it to new restaurants. He further reinforced the claim that Portillo's new-unit development strategy was succeeding by stating that new restaurants continued to "outperform our underwriting expectations" and that the Company was "opening and operating our new restaurants incredibly well."

27. On February 27, 2024, the Company filed its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2023 (the "2023 Form 10-K"), with the SEC. The 2023 Form 10-K contained the Company's "Growth Strategies," which included expanding its restaurants 12% to 15% annually and a long-term opportunity to grow to over 900 restaurants. The 2023 Form 10-K stated that the Company's short-term focus was growth in the "Sunbelt," most notably, Texas, Arizona, and Florida. Portillo's stated that, "[o]ver the past year, our development function has made great strides in creating scalable, repeatable processes, giving us confidence as we grow nationally."

28. Defendant Osanloo, among others, signed the 2023 Form 10-K.

29. During the Company's fourth quarter and year-end 2023 earnings call, held with analysts and investors that same day, defendant Osanloo again emphasized the strength of the Company's expansion platform and stated: "I've never been more confident about our future." Defendants highlighted strong development momentum, planned at least nine restaurant openings in 2024, and continued to portray Texas as a successful and attractive growth market.

30. On March 12, 2024, Portillo's participated in the Bank of America Consumer & Retail Technology Conference. During the conference, defendant Osanloo stated that Portillo's was "growing faster and further than ever" and repeatedly promoted expansion in Texas and other states. Defendant Osanloo specifically represented that "[t]he margin profile for us in Texas will

be fantastic" and the Company's Chief Financial Officer stated that Portillo's goal was "to get to scale as quickly as possible."

31. On November 5, 2024, Portillo's announced its results for the third quarter ended September 29, 2024. Although same-restaurant sales declined 0.9% and transactions declined 3.5%, the Company reaffirmed its long-term target of 12% to 15% annual unit growth and continued to emphasize expansion in Texas. The Quarterly Report on Form 10-Q for the third quarter, filed the same day, reported that revenue growth was primarily attributable to new restaurant openings even as restaurant operating expenses increased 9.1%.

32. During the ensuing earnings call held with analysts and investors, defendant Osanloo highlighted the Company's expansion, particularly in Texas. In particular, he stated:

> Also, next year, we'll pulse advertising in Dallas-Fort Worth as we scale up. The ad campaigns will educate and reintroduce even more guests to Portillo's. Previous ad campaigns in new markets have all driven meaningful traffic lifts, and we're confident Dallas will respond similarly. Our second strategic pillar focuses on building restaurants with industry-leading returns. I'm excited to share that last month, we opened our first Houston area restaurant in Richmond, Texas. This marks a significant milestone as we expand further into Texas in the Sunbelt. The reception in Houston has been incredible. Richmond sales are in line with what we observed 2 years ago in the Colony, our first Dallas area restaurant. Its clear guests are just as excited to see us in Houston as they were in Dallas.
>
> And we remain on track to open 10 restaurants this year. We have an exciting pipeline next year that will grow our restaurant count by 12% to 15%.

33. On February 25, 2025, Portillo's filed its Annual Report on Form 10-K for the fiscal year ended December 29, 2024 (the "2024 Form 10-K"), with the SEC, which was signed by defendant Osanloo. The 2024 Form 10-K identified one of the Company's four strategic pillars as "Build Restaurants with Industry-Leading Returns" and stated that, en route to its goal of more than 900 restaurants, Portillo's would continue to innovate its business model "while delivering outstanding returns to investors."

34. The 2024 Form 10-K expressly represented that rapid density in new markets would improve, rather than dilute, restaurant economics, stating:

> Scale Quickly: Having scale in markets creates brand awareness, drives sales, and expands profit margins. We aim to have minimum efficient scale (6-8 restaurants) in new markets within 24 months of our first opening. Our entry into the Dallas-Fort Worth, Texas market is a great example of this strategy, where our first restaurant opened in January of 2023 and our 7th restaurant opened in December 2024.

35. The 2024 Form 10-K also stated that Portillo's possessed "scalable and predictable processes" that would permit the Company to meet or beat an eighteen-month development cycle and become "more meticulous" in its market-penetration strategies. It further stated that the Company's near-term growth strategy would leverage its "proven unit economic model" primarily outside Chicagoland, with particular focus on Texas, and that the development function had made "great strides in creating scalable, repeatable processes, giving us confidence as we grow nationally."

36. The 2024 Form 10-K projected twelve new restaurants in fiscal 2025 and maintained long-term targets of 12% to 15% annual unit growth, mid-teens revenue growth, and low-teens Adjusted EBITDA growth.

37. On May 6, 2025, Portillo's filed its Quarterly Report on Form 10-Q for the first quarter ended March 30, 2025 (the "Q1 2025 Form 10-Q"), with the SEC, which was signed by defendant Osanloo. The filing reiterated that the Company planned to open twelve new restaurants in fiscal 2025 and that its near-term growth strategy was focused on leveraging its "proven unit economic model" outside of the Chicago area, particularly in Texas, including entry into San Antonio. The Q1 2025 Form 10-Q maintained the Company's long-term targets of 12% to 15% annual unit growth, mid-teens revenue growth, and low-teens Adjusted EBITDA growth.

38. Defendants' statements referenced above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about Portillo's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them, as follows:

(a) that the Company's initial opening of the restaurant in Colony, Texas, did not go smoothly and Portillo's did not pre-market its new Texas restaurants thoroughly;

(b) Portillo's was not disciplined about its new store openings;

(c) the Company's new Texas restaurants were faring poorly, as it was not disciplined about the opening of new locations;

(d) the Company would turn to loyalty programs and other discounts to drive sales;

(e) additional store openings did not lead to increased brand awareness, or such brand awareness did not result in an increase in sales; and

(f) that based on the foregoing, Defendants' statements concerning Portillo's growth prospects was false and misleading.

**THE TRUTH IS SLOWLY REVEALED THROUGH A SERIES OF PARTIAL DISCLOSURES**

39. On August 5, 2025, before the market opened, the Company issued a press release reporting its financial results for the second quarter ended June 29, 2025. Portillo's also provided disappointing guidance, cutting its 2025 revenue growth projections approximately in half and announcing that it now expected Adjusted EBITDA growth to be flat to low single digits from the previously guided high single digits. In particular, the Company provided the following revisions:

**Fiscal 2025 Financial Targets**

Based on current expectations, management has updated financial targets for fiscal 2025 as follows:

| | Prior Target | Updated Target |
|---|---|---|
| Unit growth | 12 new units | 12 new units |
| Same-restaurant sales | 1% to 3% | 1% to 3% |
| Revenue growth | 10% to 12% | **5% to 7%** |
| Commodity inflation | 3% to 5% | 3% to 5% |
| Labor inflation | 3% to 4% | 3% to 4% |
| Restaurant-level adjusted EBITDA margin* | 22.5% to 23% | 22.5% to 23% |
| General and administrative expenses | $80 - $82 million | **$78 - $80 million** |
| Pre-opening expenses | $11 - $12 million | $11 - $12 million |
| Adjusted EBITDA growth* | 5% to 8% | **Flat to Low single-digits** |
| Capital expenditures | $97 - $100 million | $97 - $100 million |

40. During Portillo's earnings call held with analysts and investors that same day, defendant Osanloo blamed the disappointing financial results on the "slower start" on the Company's Texas restaurants. Defendant Osanloo explained that when Portillo's opened its first restaurant in Colony, Texas, "[w]e put a lot in, in pre-marketing at that restaurant. And it was just an enormous opening that almost broke the restaurant. So, we quickly then tamped down all marketing. And Houston was the result of that. We started off slow in Houston. And the fill-ins in Dallas were slow because we didn't really have a lot of active marketing going on." Defendant Osanloo also stated that, "In hindsight, we probably overcorrected at times in Texas to manage volumes and maintain service. We've since learned the importance of sustained marketing investment and have beefed up our efforts to accelerate awareness and drive revenue in Texas[.]"

41. Despite the negative results, defendant Osanloo continued to tout the Company's prospects. In particular, defendant Osanloo, in response to an analyst's question, claimed that "we remain confident on mid-teens revenue growth." He also stated during the conference call that, "[w]hen we went from 2 to 4 restaurants, we saw a material improvement in both awareness, in revenues, but most importantly, in our margin profile in Arizona. ***And I'm really confident that we're going to see the same dynamic as Texas matures and that as the demand for us catches up with the supply of restaurants***."

42. Defendant Osanloo also stated that the Company continued to expect to open twelve new restaurants in 2025.

43. On this news, Portillo's stock price fell $2.21 per share, or 23.2%, from $9.49 per share on August 4, 2025, to close at $7.28 per share on August 5, 2025, on unusually high volume.

44. Just a month later, on September 10, 2025, Portillo's issued a press release announcing a "Business Update" that began to walk back the Company's rapid expansion plans. Instead of opening twelve restaurants in 2025, the Company now only expected to open eight. Portillo's also revealed that it expected same-restaurant sales to decrease, in contrast to defendant Osanloo's previous positive statements that as the Texas market matures "demand [will] catch[] up." In particular, the Company provided the following revised targets for the 2025 fiscal year:

| | Prior Target | Updated Target |
|---|---|---|
| Unit growth | 12 new units | 8 new units |
| Same-restaurant sales* | 1% to 3% | (1%) to (1.5%) |
| Revenues** | 5% to 7% | $730-733 million |
| Restaurant-level adjusted EBITDA margin** | 22.5% to 23% | 21.0% to 21.5% |
| General and administrative expenses | $78 - $80 million | $72 - $75 million |
| Pre-opening expenses | $11 - $12 million | Approximately $9 million |
| Adjusted EBITDA** | Flat to Low single-digits | $94 - $98 million |

45. On November 4, 2025, the Company issued a press release reporting its fiscal results for the third quarter ended September 28, 2025. During the ensuing earnings call held that same day with analysts and investors, the Company admitted that it had "added too many locations too quickly and too close together over the past 24 months, particularly in Texas" and that this approach had produced "a number of restaurants with initial volumes that are not sufficient to deliver healthy economics."

46. On January 12, 2026, the Company presented at the ICR Conference 2026. During the presentation, Portillo's Chairman and Interim Chief Executive Officer, Michael A. Miles, provided a still more direct admission concerning the failed expansion effort and new restaurant cannibalization, explaining: "[O]ver the last several years, we tried to go into new markets and

rapidly penetrate them, which led us, frankly, to open too many restaurants too quickly and too close together in Texas[,]" and that "each successive restaurant just divided up the demand that we had amongst more and more[.]"

47. On May 5, 2026, Portillo's filed its Quarterly Report on Form 10-Q for the first quarter ended March 29, 2026 (the "Q1 2026 Form 10-Q"), with the SEC. The Q1 2026 Form 10-Q reported that same-restaurant sales declined 0.1%, operating income fell to $4.5 million from $10.4 million, the Company recorded a net loss of $0.5 million, Adjusted EBITDA fell to $18.5 million from $21.2 million, and Restaurant-Level Adjusted EBITDA Margin fell to 19.1% from 20.8%.

48. The Q1 2026 Form 10-Q disclosed that restaurants opened in fiscal 2024 generated approximately $8.4 million in quarterly revenue, down 30% from $11.9 million in the comparable quarter, and attributed increased labor and occupancy percentages in part to "deleverage from our newer restaurant openings" and "revenue deleverage at new restaurants."

49. The Q1 2026 Form 10-Q further stated that the Company would concentrate on three priorities, including "a more integrated and targeted marketing approach" and "a disciplined development strategy." Portillo's also disclosed an additional $0.5 million in dead-site costs and $0.5 million in costs related to the strategic reset of its development and growth plans.

50. The Q1 2026 Form 10-Q disclosures confirmed that Portillo's had not developed the proven, repeatable, and highly profitable expansion model Defendants had portrayed. Instead, the Company had expanded too quickly in markets where awareness and demand were insufficient, placed restaurants too close together, cannibalized demand, incurred millions of dollars in dead-site and strategic-reset costs, and ultimately adopted a slower and more disciplined development strategy.

51. This news shocked analysts and investors. As a result, the price of Portillo's common stock dropped precipitously from $5.72 per share when the market closed on May 4, 2026, to $4.79 per share when the market closed on May 5, 2026, a drop of 16.3%. The Company's stock continued to fall over the following trading days and closed at just $3.93 per share on May 18, 2026, a total drop of $1.79 per share, or 31.2%, on unusually high trading volume.

52. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Portillo's common stock, Plaintiff and the other members of the Class (as defined herein) have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

53. Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Portillo's common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors and affiliates of the Defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

54. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Portillo's common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Portillo's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

55. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

56. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

57. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' statements during the Class Period were materially false and misleading;

(b) whether Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c) the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

58. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

59. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or

acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Portillo's, and their control over and/or receipt and/or modification of Portillo's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

60. Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including defendant Osanloo.

61. Defendant Osanloo, because of his position with Portillo's, controlled the contents of Portillo's public statements during the Class Period. Defendant Osanloo was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of his positions and access to material non-public information, defendant Osanloo knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, defendant Osanloo is responsible for the accuracy of Portillo's corporate statements and is, therefore, responsible and liable for the representations contained therein.

## LOSS CAUSATION

62. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Portillo's common stock and operated as a fraud or deceit on Class Period purchasers of Portillo's stock by failing to

disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Portillo's common stock declined significantly as the prior artificial inflation came out of the stock's price.

63. As a result of their purchases of Portillo's common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Portillo's common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $15.39 per share.

64. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Portillo's business, risks and future financial prospects. When the truth about the Company was revealed to the market, the price of Portillo's common stock fell significantly, dropping to below $4 per share by May 18, 2026, removing the inflation therefrom and causing economic loss to investors who had purchased Portillo's common stock during the Class Period.

65. The decline in the price of Portillo's common stock after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Portillo's common stock negates any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

66. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Portillo's

common stock and the subsequent significant declines in the value of Portillo's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF THE PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

67. At all relevant times, the market for Portillo's common stock was an efficient market for the following reasons, among others:

(a) Portillo's common stock met the requirements for listing and was listed and actively traded on the Nasdaq, a highly efficient, national stock market;

(b) as a regulated issuer, Portillo's filed periodic public reports with the SEC;

(c) Portillo's regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Portillo's was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

68. As a result of the foregoing, the market for Portillo's common stock promptly digested current information regarding Portillo's from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Portillo's common stock during the Class Period suffered similar injury through their purchases of Portillo's common stock at artificially inflated prices and a presumption of reliance applies.

69. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because

the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

70. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Portillo's who knew that those statements were false when made.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

71. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

72. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Plaintiff and others similarly situated in connection with their purchases of Portillo's common stock during the Class Period.

74. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Portillo's common stock. Plaintiff and the Class would not have purchased Portillo's common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

75. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Portillo's common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against All Defendants

76. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

77. The defendant Osanloo acted as a controlling person of Portillo's within the meaning of Section 20(a) of the Exchange Act. By reason of his positions with the Company, and his ownership of Portillo's stock, his direct involvement in the Company's day-to-day operations, and his power to control and influence, and his participation in the making of, the Company's public statements and SEC filings, defendant Osanloo exercised general control over the operations of Portillo's and possessed the power and ability to control the specific acts, statements, and transactions giving rise to the primary violation alleged herein, whether or not that power was exercised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Designating Plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: November 11, 2026

MILLER LAW LLC

/s/*Lori A. Fanning*
Lori A. Fanning
53 West Jackson Boulevard, Suite 1320
Chicago, IL 60604
Telephone: (312) 332-3400
E-mail: lfanning@millerlawllc.com

ROBBINS LLP
Brian J. Robbins
Gregory E. Del Gaizo
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
gdelgaizo@robbinsllp.com

Attorneys for Plaintiff

1740600